STATE of Missouri, Plaintiff–Respondent,

v.

Daniel E. PHILLIPS, Defendant–Appellant.

No. SD 29960.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 19, 2010.

Matthew Ward, Columbia, MO, for Appellant.

Chris Koster, Attorney General, and John W. Grantham, Assistant Attorney General, Jefferson City, MO, for Respondent.

GARY W. LYNCH, Presiding Judge.

Daniel E. Phillips ("Defendant") appeals the trial court's judgment convicting him of two counts of statutory sodomy in the first degree, pursuant to section 566.062.[1] Defendant contends that the trial court plainly erred in denying his motion to suppress and admitting his oral and written confessions to law enforcement into evidence at trial. Finding no plain error as alleged, we affirm.

1. All statutory references are to RSMo 2000, unless otherwise indicated.

### Factual and Procedural Background

We "consider the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and we reject all contrary evidence and inferences." *State v. Lloyd*, 205 S.W.3d 893, 898 (Mo.App.2006). Viewed in this light, the following evidence was adduced at trial.

Victim is the adopted son of Defendant and B.P. The three of them lived together at their home in Rolla, Missouri, until July 2005, when Defendant and B.P. were divorced. For a year and a half, beginning in 2002 when Victim was seven years old, Defendant would routinely go into Victim's bedroom about an hour after he had gone to bed at night. While in the room, Defendant would fondle Victim's genitalia by cupping his hand around Victim's penis and testicles and moving them up and down in a circular motion. This occurred three to four nights a week.

In July 2005, B.P. and Victim moved in with B.P.'s daughter in Springfield for one year. Then, in the summer of 2006, B.P. and Victim moved to Michigan to live with B.P.'s sister. After moving to Michigan, Victim told B.P. about the sexual abuse he received from Defendant. B.P. called a police station in Michigan and the Rolla Police Department, and Lieutenant Jason Smith of the Rolla Police Department began an investigation.

As part of his investigation Lieutenant Smith personally interviewed Defendant. After the interview, Lieutenant Smith asked Rick Hope, a detective at the Phelps County Sheriff's Department, to conduct an interview of Defendant. During the subsequent interview between Defendant and Detective Hope, which occurred at the sheriff's department on November 1, 2006, Lieutenant Smith was present in an adjoining room that had a one-way glass he could see through, and he listened to the interview with headphones.

On that day, before Defendant entered the interview room at the sheriff's department, Detective Hope made it clear to Defendant that he was free to leave the room at any time. Defendant was not placed in handcuffs and was seated in a chair located next to an unlocked door. Detective Hope advised Defendant of his *Miranda*[2] rights. He then asked Defendant a series of questions related to those rights and the waiver of those rights from a written form to make sure Defendant understood them. He recorded Defendant's answers on that form, and then Defendant signed it. Defendant acknowledged to Detective Hope that he could request an attorney "any time I want."

In gathering background information from Defendant during the interview, which was audio-recorded, Detective Hope asked him, "What grade did you go to in school?" Defendant replied, "Eighth grade, I think, is the last one I went to. I can do high school work, used to be able to. A lot of my schooling was one[–]room classes."

Hope administered several polygraph examinations during the interview when he questioned Defendant about Victim's abuse allegations, which Defendant initially denied. Before giving him the polygraph test, Detective Hope informed Defendant that he did not have to be there, and if for any reason he did not want to take the polygraph test, Detective Hope would refuse to test him. Defendant stated he wanted to take the polygraph test. After administering the test, Detective Hope told Defendant that he could tell from the polygraph results that he was lying about his behavior toward Victim.

---

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

At points in their discussions during this interview, Detective Hope appealed to Defendant's religious beliefs in order to encourage him to tell the truth. He told Defendant, "When you sin, God forgives .... and that's why he died on that cross for us[.]" Detective Hope also told Defendant that he was sick and needed treatment, and that "the only way you can get that help ... is if you're straight-up and honest with not only me, but yourself, and the Good Lord himself, because he forgives. He forgives."

Defendant eventually confessed to Detective Hope that he rubbed Victim's penis and testicles between 75 and 125 times when Victim was seven and eight years old. According to Defendant, this occurred in Victim's bedroom at nighttime while they were living at their house in Rolla. At Detective Hope's suggestion, but while Hope was outside the interview room, Defendant wrote a letter of apology to Victim. When Detective Hope returned, Defendant signed the letter and added by his signature the sentence "This is the truth."

After the interview, Lieutenant Smith spoke briefly with Defendant. He confirmed Victim's age during the period of abuse, and asked Defendant how many times he had fondled Victim's penis, which Defendant said was between 75 and 90 times.

Defendant was charged with two counts of statutory sodomy in the first degree for the periods of January 1, 2002, to December 31, 2002, and January 1, 2003, to December 31, 2003. Before trial, Defendant filed a motion to suppress in which he requested that the trial court suppress evidence of his confession because Detective Hope "bullied and coerced" him into confessing. The parties stipulated that the trial court could decide the motion based solely on the partial transcript of the November 1 interrogation attached to it. The trial court denied the motion.

At trial, Detective Hope testified, without objection, that Defendant confessed to him during the November 1 interview that, "he rubbed [Victim's] penis at least 75 times but not more than 125 times[,]" that "not only did he rub his penis, but he also rubbed his testicles[,]" and that Victim "had a rather large penis for an eight-year-old child, and that he was fascinated with the size of his penis." Detective Ford further testified, again without objection, that Defendant admitted during the November 1 interview that this sexual contact occurred at their home in Rolla when Victim was eight years old. Following this testimony during Detective Ford's direct examination, the portion of the audio recording containing Defendant's confession during the November 1 interview and Defendant's letter of apology, written and signed by him during the November 1 interview, were admitted into evidence. The audio tape was played for the jury, and the letter was published to the jury. The only objection made by Defendant to the admission into evidence of any of the statements made by Defendant during the November 1 interview was related to the foundation for the audio recording. Believing that Detective Ford had stated that the audio recording exhibit was of the entire interview, Defendant's trial counsel objected to its admission "on foundation." In defense counsel's voir dire of the witness on this issue, Detective Ford testified that the offered exhibit was not the entire interview, but rather only the confession portion of it. The trial court overruled Defendant's objection and admitted the audio tape into evidence.

During Defendant's case, Defendant testified that he felt pressured into confessing and that he felt intimidated by the detective. Defendant claimed that at one point

Detective Hope began pecking him in the chest with his knuckles, but Lieutenant Smith contradicted this, stating there was never any aggressive physical contact between Defendant and Detective Hope.

The jury found Defendant guilty as charged on the two counts of first-degree statutory sodomy. The trial judge sentenced Defendant to consecutive terms of ten years' imprisonment.

This appeal timely followed, wherein Defendant's sole contention is that the trial court plainly erred in denying his motion to suppress and admitting his November 1 oral and written confessions into evidence at trial. In particular, Defendant argues that the length of the interrogation and the "improper tactics" used by Detective Hope in appealing to Defendant's religious beliefs and exploiting his lack of education made his confession involuntary, in violation of the Fifth and Fourteenth Amendments of the United States Constitution, as well as article I, section 19 of the Missouri Constitution.

### Standard of Review

Where evidence is challenged by a motion to suppress that is later denied by the trial court and that evidence is thereafter admitted at trial, we review only the admission of that evidence and not the denial of the motion to suppress. *State v. Barriner*, 210 S.W.3d 285, 296 (Mo.App.2006). A motion to suppress is interlocutory in nature, and therefore not binding on the trial court. *State v. Edwards*, 280 S.W.3d 184, 188 (Mo.App.2009). A specific objection must be made when the evidence is offered at trial in order to preserve the issue for appellate review. *Id.*

In our review of the trial court's ruling, allowing the appellant's confession over the appellant's objection that it was involuntary, we consider not only the trial record, but also the record of the prior suppression hearings. Our review is limited to determining whether the trial court's ruling is supported by substantial evidence. We will not overturn the trial court's ruling absent manifest error. In our review, we are to pay deference to the trial court's factual and credibility determinations in making its ruling, viewing the facts in a light most favorable to the ruling. Hence, the fact that there is support in the record for a contrary ruling is immaterial. *Barriner*, 210 S.W.3d at 299 (internal citations and quotations omitted).

Counsel's failure to object to the admission of the evidence at the earliest opportunity constitutes a waiver of the claim. *Id.*; *see also State v. Evenson*, 35 S.W.3d 486, 491 (Mo.App.2000). Unpreserved issues, like the one Defendant raises in this appeal, may be reviewed only for plain error, pursuant to Supreme Court Rule 30.20. *Edwards*, 280 S.W.3d at 188.

Rule 30.20 is no panacea for unpreserved error, and does not justify review of all such complaints, but is used sparingly and limited to error that is evident, obvious, and clear. [N]ot all prejudicial error—that is, reversible error—can be deemed plain error. A defendant's Rule 30.20 burden is much greater—not merely to show prejudice, but manifest injustice or a miscarriage of justice—which in this context means outcome-determinative error.

We are not required to review for plain error; to do so is within our discretion. The two-step analysis is (1) did the trial court commit evident, obvious, and clear error affecting the defendant's substantial rights; and (2) if so, did such plain error actually result in manifest injustice or a miscarriage of justice? Unless a defendant gets past the first step, any inquiry should end.

*State v. Smith*, 293 S.W.3d 149, 151 (Mo. App.2009) (internal citations and quotations omitted).

### Discussion

 The Due Process clause of the Fourteenth Amendment prohibits convictions based in whole or in part on involuntary confessions. *State v. Brown*, 246 S.W.3d 519, 528 (Mo.App.2008). *See also Miller v. Fenton*, 474 U.S. 104, 109–10, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). "The test for voluntariness is whether, under the totality of the circumstances, the defendant was deprived of free choice to admit, to deny, or to refuse to answer and whether physical or psychological coercion was of such a degree that defendant's will was overborne at the time he confessed." *Brown*, 246 S.W.3d at 528; *see also State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998). Factors we consider in evaluating the totality of the circumstances include, but are not limited to, whether the defendant was advised of his rights and understood them, the defendant's mental and physical state, the length of questioning, and the withholding of food, water, or other physical needs. *Rousan*, 961 S.W.2d at 845. Evidence of police coercion is necessary to find that a confession is involuntary and thus inadmissible. *Id.*

The length of the interrogation, one of the relevant factors mentioned above, is one of the bases for Defendant's claim that his confession was involuntarily made. At the point in the trial when the confessions were offered and admitted into evidence, however, there was no evidence before the trial court from which it could made a reasonable estimation as to the interview's length. The stipulated partial transcript of the interview before the trial court in the hearing on Defendant's motion to suppress has no time markings or references either by the transcriber or in any of the questions and answers with which to indi-

cate its length. The fact that it was a partial transcript also obscures any method by which the trial court could glean from it the total length of the interview. Likewise, the only evidence at trial related to the November 1 interview up to the point of admission of the confessions into evidence was Detective Hope's partially completed direct testimony. Nothing in that testimony related to the length of the interview.

 Rather, Defendant is claiming that the trial court plainly erred by failing to *sua sponte* deny admission of Defendant's November 1 confessions into evidence because after they were admitted into evidence and published or played to the jury, Detective Hope testified on cross-examination that Defendant's interrogation lasted approximately four and a half hours. Initially, we question whether the trial court's lack of clairvoyance as to the length of the interview can ever rise to the level of being an evident, obvious, and clear error.

We need not answer that question because, even assuming the trial court had known the length of the interview at the time Defendant's confessions were admitted into evidence, we do not believe that the length played a substantial part in creating a hostile or oppressive atmosphere in the interview room such that Defendant's confession was involuntary. Missouri courts have found confessions to be voluntary which resulted from interrogations that lasted as long as or longer than Defendant's. *See State v. Smith*, 735 S.W.2d 65, 68 (Mo.App.1987) (holding defendant's confession to be voluntary when it came after six and a half hours in custody with intermittent interrogation); *State v. Simpson*, 606 S.W.2d 514, 517 (Mo.App. 1980) (holding that continuous questioning for four hours is not coercive). Further-

more, there is no evidence that Defendant was subjected to oppressive, uncomfortable, or coercive conditions during the interrogation. Detective Hope did not place Defendant in handcuffs or otherwise restrain him, did not touch him in an aggressive way, and at least once during the interview, he gave Defendant the opportunity to get a drink and use the restroom. Also, Detective Hope made clear at the outset of the interrogation that Defendant could terminate the interview at any time. Accordingly, Defendant's interrogation was not overly long. Likewise, there is no evidence to suggest that the interview's length considered in combination with the nature and setting of the interrogation otherwise made Defendant's confessions involuntary.

 Defendant also claims that Detective Hope's "improper tactics," including his appeal to Defendant's religious faith, rendered the confession involuntary. This allegation is also without merit. Only "threats of harm or promises of worldly advantage," as opposed to moral and spiritual entreaties, can yield involuntary confessions. *State v. Williamson*, 339 Mo. 1038, 99 S.W.2d 76, 79 (1936); *see also State v. Johnson*, 207 S.W.3d 24, 45 (Mo. banc 2006) (holding that in order to yield an involuntary confession, a promise must be for "worldly advantage" and not just moral or spiritual gain). In particular, the promise by law enforcement must directly relate to the mitigation of the accused's punishment; it is not sufficient that it "offer merely an opportunity for the gratification of his personal desires, or for his greater comfort[.]" *Williamson*, 99 S.W.2d at 79.

Here, Defendant objects to Detective Hope's exhortation that he be honest so that God would forgive him of his sins. While the cynic may question the sincerity of the Detective's spiritual advice, these remarks clearly did not represent promises of worldly benefit, nor did they suggest that by confessing Defendant would be able to escape punishment or incur a lesser one. Similarly, in *Johnson,* there was a discussion between the murder suspect in custody and a detective where the detective told the suspect that in order to be forgiven of his wrongdoing he would have to be completely truthful about what he had done. *Johnson,* 207 S.W.3d at 33. Soon after, the defendant confessed to law enforcement of his crimes. *Id.* On appeal, the Supreme Court of Missouri, citing to *Williamson,* held that the detective's comments were not "improperly coercive" because they promised no worldly benefit. *Id.* at 46. Likewise, Detective Hope's remarks to Defendant about forgiveness did not amount to improper coercion. An appeal to a suspect's religious beliefs does not render his confession involuntary unless other circumstances indicate that his will was overborne, and Defendant in this case has put forth no such evidence.

 Defendant also argues that Detective Hope took unfair advantage of the fact that Defendant has just an eighth-grade education when he told Defendant that he could not remember abusing Victim because he suffered from "repressed metamorphism," a term that Detective Hope admitted he made up. The issue of whether Defendant's limited education had anything to do with him being unable to understand this fabricated diagnosis, however, is entirely speculative. It is also not evident that there was a causal connection between the detective's "repressed metamorphism" remark and Defendant's eventual confession, since Defendant continued to deny wrongdoing after Detective Hope's comment.

It is worth noting that Detective Hope read Defendant his *Miranda* rights at the start of the interview, and Defendant indi-

cated repeatedly that he understood them, which is another relevant consideration that suggests Defendant's confession was voluntary.[3] Additionally, Defendant chose to speak with law enforcement knowing that he was not required to be there and that he could leave anytime, and he knew that if he chose to stay he could request an attorney at any time.

For the foregoing reasons, from the totality of the circumstances, we cannot conclude that Defendant confessed involuntarily. Defendant has presented no evidence of police coercion, and the points he raises about the length of the interrogation and Detective Hope's "improper tactics" are without merit.

Therefore, we do not find that Defendant has shown that the trial court committed any error, much less an "evident, obvious, and clear" error, as required in the first step of a plain-error analysis, in admitting Defendant's November 1 confessions into evidence. *Smith*, 293 S.W.3d at 151. Because we do not find that the trial court committed any error, plain or otherwise, our inquiry ends. *Id.* Defendant's point is denied.

### Decision

The trial court's judgment is affirmed.

SCOTT, C.J., and FRANCIS, J., concur.

---

**3.** Although Detective Hope chose to read Defendant his Miranda rights, it is not entirely clear this was necessary since the circumstances do not clearly indicate that Defendant was in "custody" during the interview. *See* *State v. Taylor*, 109 S.W.3d 190, 192 (Mo.App. 2003) (discusses the six factors we will consider when determining custody). In any event, Defendant does not raise any alleged *Miranda*-related violations on appeal.